## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

Case No.  08-35118

BRIAN DOUGLAS SPIVEY

          Debtor

      DAVID N. KING and
      ANTHONY G. BROWN, individually,
      BROWN, KING CONSTRUCTION, LLC,
      h/f/d/b/a BROWN, KING, SPIVEY GROUP, LLC

          Plaintiffs

       v.

Adv. Proc. No.  09-3028

      BRIAN DOUGLAS SPIVEY, individually,
      and h/f/d/b/a BRIAN SPIVEY CONSTRUCTION

          Defendant

## M E M O R A N D U M

**APPEARANCES**:   THE LAW OFFICES OF DOUGLAS L. DUNN, P.C.
                 Douglas L. Dunn, Esq.
                 706 Walnut Street
                 Suite 402
                 Knoxville, Tennessee  37902
               GLENNA W. OVERTON LAW FIRM
                 Glenna W. Overton, Esq.
                 Post Office Box 31651
                 Knoxville, Tennessee  37930-1651
                 Attorneys for Plaintiffs

               TROUTMAN & TROUTMAN, P.C.
                 C. Mark Troutman, Esq.
                 Post Office Box 757
                 LaFollette, Tennessee  37766
                 Attorneys for Defendant

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint to Determine Nondischargeabliity of Debt Pursuant to 11 U.S.C. § 523 (Complaint) filed by the Plaintiffs on March 16, 2009, asking the court to award them a money judgment and requesting a determination that the judgment is nondischargeable under 11 U.S.C. § 523(a)(2), (4), and/or (6) (2006).  The trial was held on May 24, 2010.  The record before the court consists of twenty-one exhibits introduced into evidence, along with the testimony of four witnesses, Julie Spivey, the Plaintiffs, David N. King and Anthony G. Brown, and the Defendant, Brian Douglas Spivey.  Following the trial, the court directed the parties to file proposed findings of fact and conclusions of law, which were filed by each party on July 30, 2010.

This is a core proceeding.  28 U.S.C. § 157(b)(2)(I) (2006).

# I

Pursuant to an Operating Agreement executed on November 28, 2006, the parties formed Brown, King, Spivey Group, LLC (BKS LLC or the LLC), a limited liability company established under the laws of the State of Tennessee, for the purpose of constructing, developing, and operating residential and commercial real property for profit.  COLL. TRIAL EX. 1.  Each contributed to the initial startup account, with the Defendant and the Plaintiff, Anthony G. Brown, holding a 33% interest, while the Plaintiff, David N. King held a 34% interest.  COLL. TRIAL EX. 1.  Mr. Brown was to be primarily responsible for finance and accounting and administration, Mr. King was to be primarily responsible for marketing, and the Defendant was to be primarily responsible for job-site management.  TRIAL EX. 2.  Because he was a general contractor licensed by the State of Tennessee

2

with a $250,000.00 residential construction limit and based upon his representations that he was experienced in running a business, the Defendant was also appointed as managing member of BKS LLC, although he was not to receive any additional payment for serving in that capacity. COLL. TRIAL EX. 1. Under the Operating Agreement, the Defendant's authority as managing member included all rights and powers necessary to manage the business and affairs of BKS LLC and his responsibilities included, but were not limited to, furnishing financial reports and records of the LLC to the other members, ensuring tax returns were filed, executing documents on behalf of the LLC, conducting the day-to-day management of the LLC, and employing attorneys, certified public accountants, and other persons to assist in the management of the LLC. COLL. TRIAL EX. 1. His duty of care, as required of the managing member, was set forth in Section 11 of the Operating Agreement at page 14 as follows:

> A Managing Member's duty of care in the discharge of the Managing Member's duties to the Limited Liability Company and the Members is limited to refraining from engaging in grossly negligent conduct, intentional misconduct, or a knowing violation of law. In discharging the duties of a Managing Member, the Managing Member shall be fully protected in relying in good faith upon the records of the Limited Liability Company and upon such information, opinions, reports, or statements by other Managing Members, Members, agents or other persons as to matters the Managing Member reasonably believes are within such person's professional or expert competence, including without limitation information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Limited Liability Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

COLL. TRIAL EX. 1.

Following its formation, BKS LLC obtained construction loans with First Tennessee Bank totaling approximately $1,300,000.00, which were also personally guaranteed by the Plaintiffs and

3

the Defendant, along with an operating line of credit in the amount of $100,000.00 from First

Tennessee Bank and an American Express credit card to be used to pay expenses and finance the

LLC's projects. *See, e.g.,* COLL. TRIAL EX. 3.  The loan proceeds were used to purchase seventeen

lots – thirteen in Montclair subdivision and four in Cantrell Heights subdivision – and in February

2007, the Defendant pulled the building permits for and BKS LLC began construction of homes on

Lots 1, 2, and 3 in Montclair and Lots 20, 28, 29, and 30 in Cantrell Heights.[1]  Together with the

initial investment of $1,000.00 funded by the parties, BKS LLC's sole source of funds was derived

from the American Express card and the line of credit with First Tennessee Bank.

In early November 2007, the Plaintiffs called a meeting to discuss concerns about the time-

lines for the houses being built.  At roughly that same time, the Defendant advised the Plaintiffs that

he expected a 10% builders fee, and on November 8, 2007, he advised the Plaintiffs that he was

stopping construction on the homes and would not be attending the meeting they had called.  At the

November 8 meeting, the Plaintiffs removed the Defendant as managing member of the LLC for not

providing financial information, not accounting for money borrowed for construction purposes,

starting construction on houses outside of BKS LLC, and not managing day-to-day operations in the

LLC's best interest.[2]  COLL. TRIAL EX. 4.  Subsequent to the Defendant's removal as managing

member, Mr. Brown retrieved the LLC's financial records which showed, among other things, that

although construction of the homes BKS LLC had started was not completed, the construction loans

and line of credit with First Tennessee Bank were nearly depleted, that the American Express credit

---

[1] The building permits were issued under the name of the Defendant's company, The Spivey Group, Inc.

[2] Although the minutes for the November 8, 2007 meeting state that the Defendant was removed as "a member," at trial, Mr. King clarified that the Defendant was removed as "managing member."

card had a balance of nearly $100,000.00, and that an insurance check for reimbursement of a copper

theft at Lot 20 of the Cantrell Heights subdivision had been deposited into the bank account for The

Spivey Group, Inc., a corporation controlled by the Defendant, rather than BKS LLC's account. *See*

COLL. TRIAL EX. 16; COLL. TRIAL EX. 17.  Thereafter, at a special meeting held on November 30,

2007, the Plaintiffs voted unanimously to expel the Defendant from BKS LLC for violations of items

(4) through (9) of unnumbered paragraph 6 of Article 17 of the Operating Agreement:

> The Limited Liability Company shall have the right by unanimous vote of the
> Members (excluding the Member proposed to be expelled) to expel a Member from
> the Limited Liability Company in the following events: . . .  (4) any action by the
> Member which has a detrimental effect on the Limited Liability Company's
> reputation, business, or goodwill; (5) the Member's failure or inability to perform any
> reasonable duties or workload after written notice from the Limited Liability
> Company of, and a reasonable opportunity to cure, such failure or inability; (6) any
> breach of this Agreement; (7) a course of conduct amounting to gross incompetence;
> (8) unlawful appropriation of a corporate opportunity; or (9) misconduct in
> connection with the performance of any of the Member's duties, including, without
> limitation, misappropriation of funds or property of the Limited Liability Company,
> securing or attempting to secure personally any profit in connection with any
> transaction entered into on behalf of the Limited Liability Company,
> misrepresentation to the Limited Liability Company, or any violation of law or
> regulations on Limited Liability Company premises or to which the Limited Liability
> Company is subject.

COLL. TRIAL EX. 1; COLL. TRIAL EX. 4.[3]  Pursuant to the Articles of Amendment to Articles of

Organization filed with the Tennessee Secretary of State on December 21, 2007, the name of the

LLC was changed to Brown King Construction LLC.  TRIAL EX. 5.

On February 21, 2008, The Spivey Group, Inc., through the Defendant, its president, recorded

with the Knox County Register of Deeds a Notice of Mechanic's Lien in the amount of $54,767.59

---

[3] The minutes from the November 30, 2007 special meeting entered into evidence as part of Collective Trial
Exhibit 4 erroneously cite to Article 18 rather than Article 17.

for work performed at Lot 20 in Cantrell Heights subdivision, which was paid out of the proceeds realized from the sale of that property at closing. COLL. TRIAL EX. 9. At some point thereafter, the Plaintiffs brought a lawsuit against The Spivey Group, Inc. in the Knox County Chancery Court and, using the summary of damages prepared by Mr. Brown based upon his comparison of the invoices to the construction draws entered into the record in this adversary proceeding as Trial Exhibit 10, obtained a default judgment against The Spivey Group, Inc. in the amount of $441,481.54.

The Defendant filed the Voluntary Petition commencing his case under Chapter 7 of the Bankruptcy Code on November 12, 2008, and on March 16, 2009, the Plaintiffs timely filed the Complaint initiating this adversary proceeding, requesting a monetary judgment inclusive of pre-judgment interest and attorneys' fees and a determination that the judgment is nondischargeable. The Plaintiffs contend that the Defendant obtained monies from them through misrepresentation, false pretenses, and actual fraud, that he embezzled funds from BKS LLC while in a fiduciary role, and that he maliciously intended to cause financial devastation to the Plaintiffs.

## II

It is within the jurisdiction and authority of the bankruptcy court to adjudicate the Plaintiffs' claims and award any necessary damages. *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 792 (Bankr. E.D. Tenn. 2003) (citing *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965 (6th Cir. 1993)). As evidenced by Trial Exhibit 10, which was prepared by Mr. Brown, the Plaintiffs seek entry of a nondischargeable judgment against the Defendant in the amount of $441,481.54. In

addition, the Plaintiffs have also asked the court to award them pre-judgment interest and attorneys'
fees.

The first page of Trial Exhibit 10 reflects a total of $1,407,333.41 in draws taken against the
construction loans and line of credit with First Tennessee Bank for ten lots minus $944,797.14 for
invoices paid by The Spivey Group, Inc., $22,953.10 for construction interest paid by The Spivey
Group, Inc., and $336,783.63 for the total costs of the lots, with $272,186.32 denoted as "Money not
accounted for" as of November 21, 2007.[4]  TRIAL EX. 10.  The second page reflects the following
expenses "caused by The Spivey Group," some of which were also detailed by Mr. Brown during
his testimony:  (1) $3,961.81 for late fees and missed discounts; (2) $164.80 for bookkeeper
costs/QuickBooks training subsequent to the Defendant's removal as managing member; (3) $194.44
for attorney's fees to effectuate the name change; (4) $70.00 for returned check fees on November 13
and 30, 2007; (5) $120.18 for an AVS charge due to non-return of key sensors; (6) $30,557.09 for
a 10% builders fee lien on Lot 20; (7) $24,210.50 for a lien on Lot 20 due to unverified invoices; (8)
$476.90 for interest on Mr. Brown's Mastercard; (9) $930.01 for interest on Mr. Brown's Discover
card; (10) $507.42 for interest on Mr. King's Discover card; (11) $849.02 for interest on Mr. King's
home equity loan; (12) $93,679.62 for personal charges incurred by the Defendant on BKS LLC's
American Express card; (13) $8,352.70 for interest from the Defendant's American Express charges;
(14) $4,590.73 for interest on the line of credit with First Tennessee Bank; and (15) $630.00 for a

---

[4]  Of the $272,186.32, Trial Exhibit 10 designates $84,693.39 as "Money spent over loan amount" and
$187,492.93 as "Money not accounted for."

second termite letter.[5]  TRIAL EX. 10.  These expenses total $169,295.22 which, when added to the

$272,186.32 in "Money not accounted for" from the first page of Trial Exhibit 10, provide the

$441,481.54 damages claim asserted by the Plaintiffs.

Notwithstanding Mr. Brown's testimony to the contrary, many of the expenses listed on page

2 of Trial Exhibit 10 cannot be directly attributable to any fraudulent action by the Defendant and

are thus not recoverable damages by the Plaintiffs.  Included among those amounts are the expenses

incurred by the Plaintiffs in order to keep BKS LLC operational after the Defendant's expulsion such

as the interest on the Plaintiffs' credit cards totaling $1,914.33 and the interest on Mr. King's home

equity loan in the amount of $849.02.  Likewise, the Plaintiffs have not proved a basis by which they

can assess against the Defendant what are, in actuality, legitimate business expenses such as the

$164.80 for hiring a bookkeeper to assist Mr. Brown with learning QuickBooks, $194.44 in

attorney's fee for changing the name of the company, returned check fees of $70.00, the $630.00 for

a second termite letter, and interest on the LLC's line of credit in the amount of $4,590.73.  The late

fees and missed discounts in the amount of $3,961.81 and the $120.18 charge for not returning key

sensors, however, are legitimate damages owed to the Plaintiffs by the Defendant as a result of his

actions.

With respect to the $272,186.32 in monies either spent over the loan amounts or unaccounted

for, as shown on page 1 of Trial Exhibit 10, the court similarly finds that the Plaintiffs have proved

---

[5] Page 3 of Trial Exhibit 10 contains one line referencing a "Revised Date" of November 6, 2008, but contains no other information, and page 4 details "additional funds from Dave King and Tony Brown" in the total amount of $260,949.61, representing loans from the Plaintiffs, refinancing of Lots 29 and 30, and second mortgages on Lots 29 and 30.  TRIAL EX. 10.  The amounts on page 4 do not, however, appear to be included within the damages requested, nor was any proof submitted that the Plaintiffs are entitled to reimbursement of those costs as damages.

entitlement to some, but not all, of these funds.  During his examination, Mr. Brown testified to the

following concerning the "Money spent over loan amount" as reflected in column G on page one of

Trial Exhibit 10:

> Q:  So these are monies above and beyond the draws on the construction loans that
> have been spent on those lots, yet you have included those amounts in the total of the
> [$272,186.32]?
>
> A:  Yes, I did.
>
> Q:  So . . . Mr. Spivey through his group has obviously paid somehow for those and
> you're asking him to repay you again for those amounts?
>
> A:  Again, like I stated earlier, we cannot verify some of the invoices because there
> were some questions on some SGE bills – that was another one of his companies –
> but I included all the bills that were there.
>
> Q:  All right.
>
> A:  Mr. Spivey would not provide some information on some of those bills.
>
> Q:  But these were monies that have been spent by The Spivey Group on top of the
> draw money?
>
> A:  That's correct.
>
> Q:  And you're asking him to again pay for that in connection with this action that
> you're seeking, the judgment you're seeking from him today?
>
> A:  We've had two and a half years to sort this out.
>
> Q:  All right.  And you're asking him to pay for that money again?
>
> A:  It was included in the bill, yes.
>
> Q:  It is.  If you exclude Item 1, 2, 3, 10, and 11, those numbers total $102,799.00.
> Those are the shortages.  Have you done that math?
>
> A:  No.  I can do it quickly in my head.  That's about right.

TRIAL TR. pg.111, ln.7 - pg.112, ln.11.

The court agrees that, with respect to any money spent over the loan amount, the Plaintiffs have not proved an entitlement to damages against the Defendant. Mr. Brown himself testified that he arrived at the invoice totals paid by The Spivey Group through reviewing the actual invoices and his inability to verify certain information on the invoices does not entitle the Plaintiffs to assess those funds against the Defendant a second time. Accordingly, of the $272,186.32 referenced on page 1 of Trial Exhibit 10 as being spent over the loan amount or not accounted for, only the unaccounted for funds in the amount of $187,492.93 may be rightfully included in any damages calculation.[6]

Similarly, with respect to the interest charges, Mr. Brown testified to the following:

Q:  Did you compare the interest figures you have in Column E with the interest information that the loan officer provided from First Tennessee Bank that is contained in Exhibit 21?

A:  I have not compared it to that –

Q:  Okay.

A:  – but I compared it to the actual expenses that we had at First Tennessee Bank, the actual loans up to that point that we've actually paid.

Q:  All right.  Well, if you look at page, it's the third page of the fax – it says page 2 on the fax, but it's the third page of that exhibit – those amounts for Lot 1 of Montclair First Tennessee Bank gets is $778.20.  Your amount . . . is $469.65?

A:  What – where are you referring to again?

Q:  I'm referring to Exhibit 21, the third page.

---

[6] This includes the $18,243.12 attributed to the copper wiring theft and subsequent reimbursement by State Farm Insurance Company.  The Plaintiffs proved that the Defendant deposited the $16,681.32 reimbursement check dated March 13, 2007, into The Spivey Group, Inc.'s bank account; however, they did not prove that the Defendant spent those funds on projects outside those of BKS LLC.  The court also finds the Defendant's explanation as to why he did not deposit the check into the BKS LLC checking account - that the deposit would be credited toward the loan balance and not available for payment on invoices - to be plausible and within the parties' established routine for payment of invoices by The Spivey Group, Inc. on behalf of BKS LLC.

A:  That one that says Total Interest Paid?

Q:  Yes.  You didn't compare your numbers to the numbers reflected on that exhibit, did you?

A:  No, I did not.

Q:  All right.  And that is information that came directly from First Tennessee Bank?

A:  There appears to be about a $3,000.00 difference.

Q:  All right.

A:  Now again, some of these we paid to First Tennessee after the fact that was due, so that might be reflected on Exhibit 21, second page, and we paid those out of our account after the split.

Q:  Well, you said you've had two years to, to get this together, but you didn't take in that time period of two years, you didn't take those numbers on your chart that's Exhibit 10 and attempt to reconcile them with the information that First Tennessee Bank has provided?  No?

. . . .

A:  I guess not.

TRIAL TR. pg.113, ln.4 - pg.114, ln.13.  A comparison of Trial Exhibit 21, which was faxed from

First Tennessee Bank on November 5, 2007, to Trial Exhibit 10 evidences that, in fact, $25,570.79

rather than $22,953.10 was paid to the bank in interest, and the Defendant is also entitled to a

deduction of the $2,617.69 difference.  *Compare* TRIAL EX. 21 *with* TRIAL EX. 10.


With respect to the mechanic's lien, the court finds that the Plaintiffs have not proved that

$10,488.79 of the amounts shown on the invoices attached to the mechanic's lien filed by the

Defendant for $54,767.59 are not legitimate.  Mr. King testified that neither he nor Mr. Brown were

presented with those invoices by the Defendant prior to their recordation with the Knox County

11

Register of Deeds on February 21, 2008, but that fact, alone, does not prove that the Defendant did not perform the work, did not pay subcontractors, and did not incur the expenses set forth in the invoices. The Plaintiffs have the burden of proving their entitlement to damages, but their inability to verify invoices, without more, is not sufficient. On the other hand, based upon specific testimony by Mr. King and the court's review of the record, specifically a comparison between the invoices attached to the mechanic's lien marked as Collective Trial Exhibit 9 with the Job Costs Detail Reports for Lot 20 Cantrell Heights for both BKS LLC and The Spivey Group, Inc. prepared by the Defendant and marked as Trial Exhibits 19 and 20, respectively, the court finds that the Defendant received a total of $13,721.71 for expenses that were previously paid for with BKS LLC funds and that he was not entitled to a 10% builder's fee in the amount of $30,557.09.

The Defendant attached to the mechanic's lien invoice #5000 dated November 8, 2007, in the amount of $23,124.00 for the framing of the basement, first and second floors, garage, and porches and invoice #5002 dated November 9, 2007, in the amount of $1,600.00 for the deck, stairs, and handrail. *See* COLL. TRIAL EX. 9. Handwritten on invoice #5000 are notes that $15,291.13 was paid, leaving a remaining balance of $7,832.87 and on invoice #5002 that the entire $1,600.00 is due. *See* COLL. TRIAL EX. 9. However, Trial Exhibit 20 evidencing the job costs detail for The Spivey Group, Inc. evidences that checks totaling $18,642.13 were written between April 5 and July 13, 2007, to seven different subcontractors for framing.[7] *See* TRIAL EX. 20. Additionally, Trial Exhibit

---

[7] Trial Exhibit 20 reflects that the following framing subcontractors received the following payments for work designated for Lot 20 Cantrell Heights:

(1) a total of $3,074.88 to Danny Stinnett through: (a) #5117 dated April 5, 2007, for $510.88; (b) #5129 dated April 13, 2007, for $404.13; (c) #5144 dated April 20, 2007, for $625.25; (d) #1063 dated April 28, 2007, for $600.00; (e) #5178 dated May 4, 2007, for $388.00; (f) #5192 dated May 11, 2007, for $325.50; and (g) #5206 dated May 18, 2007, for

(continued...)

19 references check #3011 dated August 17, 2007, in the amount of $2,952.00 and check #3016

dated August 23, 2007, in the amount of $2,900.00 for an additional $5,852.00 for framing

subcontractor reimbursements.  *See* Trial Ex. 19.  Assuming the figures on invoices #5000 and

5002 are correct, a total of $24,494.13 was paid for framing subcontractors, as reflected by Trial

Exhibits 19 and 20, and the Plaintiffs did not owe the $7,832.87 assessed by the mechanic's lien for

framing subcontractors but only owed $229.87, for a difference of $7,603.00 overpaid to the

Defendant by virtue of his mechanic's lien and for which the Defendant is liable.

　　Also attached to the mechanic's lien is invoice #5004 dated November 9, 2007, reflecting

a total of $9,795.00 owed for interior trim subcontract work and handwritten notes that $4,915.37

---

[7](...continued)
$221.12;

(2) a total of $6,150.00 to David Norton through (a) #5113 dated April 5, 2007, for $800.00; (b) #5126 dated April 13, 2007, for $530.00; (c) #5141 dated April 20, 2007, for $850.00; (d) #1062 dated April 26, 2007, for $880.00; (e) #5173 dated May 4, 2007, for $950.00; (f) #5190 dated May 11, 2007, for $850.00; (g) #5205 dated May 18, 2007, for $850.00; (h) #5246 dated June 8, 2007, for $300.00; and (i) #5271 dated June 15, 2007, for $140.00;

(3) $680.00 paid to Dewey Tucker by #5369 dated July 13. 2007;

(4) a total of $2,375.75 to Jeff Waggoner through (a) #5116 dated April 5, 2007, for $527.25; (b) #5130 dated April 13, 2007, for $427.50; (c) #5142 dated April 20, 2007, for $507.50; (d) #5159 dated April 28, 2007, for $558.25; and (e) #5177 dated May 4, 2007, for $355.25;

(5) a total of $1,312.50 to Richard Overholt through (a) #5114 dated April 5, 2007, for $387.50; (b) #5127 dated April 13, 2007, for $62.50; (c) #5158 dated April 28, 2007, for $275.00; (d) #5176 dated May 4, 2007, for $487.50; and (e) #5194 dated May 11, 2007, for $100.00;

(6) a total of $2,600.00 to Robert Sibley through (a) #5115 dated April 5, 2007, for $487.50; (b) #5128 dated April 13, 2007, for $275.00; (c) #5143 dated April 20, 2007, for $506.25; (d) #5161 dated April 28, 2007, for $412.50; (e) #5175 dated May 4, 2007, for $531.25; (f) #5193 dated May 11, 2007, for $262.50; and (g) #5207 dated May 18, 2007, for $125.00; and

(7) a total of $2,449.00 to Sonny R. Harless through (a) #5118 dated April 5, 2007, for $674.25; (b) #5125 dated April 13, 2007, for $310.00; (c) #5160 dated April 28, 2007, for $713.00; and (d) #5172 dated May 4, 2007, for $751.75.

Trial Ex. 20.

had been paid, leaving a balance of $4,879.63. *See* Coll. Trial Ex. 9. Nevertheless, Trial Exhibit

19 evidences that BKS LLC, through check #39502 dated August 7, 2007, paid $632.60, subject to

a credit of $73.78 issued on December 10, 2007, resulting in a payment of $558.82 to RSG Inc. for

interior trim work. *See* Trial Ex. 19. Additionally, Trial Exhibit 20 evidences that a total of

$5,675.26 was paid by The Spivey Group, Inc. between June 18 and October 19, 2007, to six

subcontractors.[8] *See* Trial Ex. 20. Comparing the combined $6,234.08 actually paid against the

$9,795.00 shown on invoice #5004, the outstanding balance was $3,560.92 rather than the $4,879.63

paid by the Plaintiffs, resulting in an overage paid of $1,318.71 for which they are now entitled.

---

[8] Trial Exhibit 20 reflects that the following interior trim subcontractors received the following payments for work designated for Lot 20 Cantrell Heights:

(1) a total of $580.00 to Dewey Tucker through (a) #5455 dated August 10, 2007, for $420.00; and (b) #5524 dated August 31, 2007, for $160.00;

(2) a total of $1,627.63 to Jeff Waggoner through (a) #5288 dated June 22, 2007, for $311.75; (b) #5310 dated June 29, 2007, for $572.75; (c) #5327 dated July 6, 2007, for $471.25; and (d) #5454 dated August 10, 2007, for $271.88;

(3) $759.89 paid to LJ Smith by #614499 dated June 18, 2007;

(4) a total of $2,402.49 to Sonny R. Harless through (a) #5287 dated June 22, 2007, for $352.62; (b) #5311 dated June 29, 2007, for $689.75; (c) #5326 dated July 6, 2007, for $651.00; (d) #5453 dated August 10, 2007, for $325.50; (e) #5538 dated September 7, 2007, for $182.12; (f) #5614 dated October 5, 2007, for $155.00; and (g) #5644 dated October 19, 2007, for $46.50;

(5) a total of $211.50 to Trevor Tucker through (a) #5456 dated August 10, 2007, for $166.50; and (b) #5525 dated August 31, 2007, for $45.00; and

(6) $93.75 paid to Will Ramsey by #5335 dated July 6, 2007.

The exhibit also reflects that RSG Inc. billed a total of $5,019.79 through the following invoices: (a) June 28, 2007, for $79.00; (b) June 20, 2007, for $1,630.00; (c) June 18, 2007, for $2,443.86; (d) July 2, 2007, for $79.00; (e) dated July 5, 2007, for $20.16; (f) July 5, 2007, for $125.72; (g) July 10, 2007, for $21.50; (h) July 9, 2007, for $556.55; and (i) July 27, 2007, for $64.00.

Trial Ex. 20.

Also attached to the mechanic's lien is invoice #5003 dated November 9, 2007, in the amount of $4,800.00 for installation, sanding, and staining of the wood floor by the flooring subcontractor. *See* COLL. TRIAL EX. 9.  At trial, Mr. King testified definitively that invoice #5003 had already been paid, naming the subcontractor as Precision Hardwood Flooring.  This testimony is supported by the handwritten notes dated February 22, 2008, on the copy of invoice #5003 entered into evidence, denoting that someone named Byron with Precision Hardwood Flooring had confirmed the work had been done and paid for.  *See* COLL. TRIAL EX. 9.  Because it had previously been paid, the Plaintiffs are entitled to recover the $4,800.00 collected by the Defendant for this invoice.

The court likewise finds that the Defendant is not entitled to the 10% builder's fee in the amount of $30,557.09 included within his mechanic's lien and referenced on the attached invoice #5013.  *See* COLL. TRIAL EX. 9.  Although the Defendant testified that he, on behalf of The Spivey Group, Inc., had an agreement with the Plaintiffs that he would be paid a 10% builder's fee by BKS LLC, there was no contract between The Spivey Group, Inc. and BKS LLC setting forth any such agreement, nor was there any reference within the Operating Agreement or other document in the record that establishes any such agreement.  Without a written contract or other such documentation, the court cannot find the existence of any such arrangement, and the Plaintiffs are entitled to recover it within their damages.[9]

There was, additionally, considerable testimony concerning the American Express charges. As evidenced by the Transaction Detail Summary for the account, each of the parties had charging

---

[9] Furthermore, based on the Job Costs Detail for BKS LLC, The Spivey Group, Inc. received checks totaling $158,243.57 and $158,543.54 between March and August 2007, for "project management" of Lots 20 and 28 Cantrell Heights, respectively.  *See* TRIAL EX. 19.

privileges on the business account and was issued a card in his own name.  Each made the following

purchases totaling $232,556.14:  between May 12 and September 13, 2007, Mr. Brown charged a

total of $1,095.85; between January 23 and October 16, 2007, Mr. King charged a total of $8,015.54,

and between January 27 and October 30, 2007, the Defendant charged a total of $223,444.75.  *See*

Coll. Trial Ex. 11.  Beginning in February 2007, the following payments totaling $157,763.30

were made to American Express by BKS LLC out of its checking account:  (1) $6,714.37 on

February 23, 2007; (2) $1,076.46 on March 19, 2007; (3) $8,311.87 on April 16, 2007; (4) $5,671.30

on May 17, 2007; (5) $7,129.10 on June 14, 2007; (6) $6,918.17 on August 14, 2007; (7) $28,367.58

on September 12, 2007; and (8) $93,574.45 on November 1, 2007.  *See* Coll. Trial Ex. 17.

Additionally, on July 16, 2007, The Spivey Group, Inc. made a payment to American Express in the

amount of $73,391.86 from its checking account.[10]  *See* Coll. Trial Ex. 13.

Of the $223,444.75 charged by him, the Defendant testified that he made personal charges

in the amount of $84,491.36 and reiterated that he made a payment from The Spivey Group, Inc. in

the amount of $73,391.86, suggesting that it was intended to be reimbursement for a portion of his

personal charges.  The beginning balance on July 2, 2007, for The Spivey Group, Inc.'s checking

account was $4,238.84.  Deposits of $15,262.24, $128,292.47, and $102,893.40 were made on

July 6, July 9, and July 11, 2007, respectively, and on July 13, 2007, the account had a balance of

$174,846.26.  *See* Coll. Trial Ex. 13.  There is no dispute that The Spivey Group, Inc. made the

$73,391.86 payment to American Express on July 16, 2007; however, there is also no question that

check #1041 dated July 6, 2007, in the amount of $15,000.00 and check #1042 dated July 11, 2007,

---

[10] There is no evidence in the record concerning when or if the Plaintiffs paid the remaining $1,400.98 balance
after crediting all payments against all transactions.

16

in the amount of $102,893.40 were written by the Defendant out of BKS LLC's bank account and deposited into The Spivey Group, Inc.'s checking account prior to the July 16 payment, raising the question of whether the $73,391.86 was, at least in part, paid for with BKS LLC funds rather than those of The Spivey Group, Inc. *See* COLL. TRIAL EX. 13; COLL. TRIAL EX. 17.

Moreover, pursuant to its own independent review of the Transaction Detail Report for the Defendant's charges compared to the Job Costs Detail for The Spivey Group, Inc. for January through December 2007 prepared by the Defendant, the court finds a number of charges made by the Defendant on the American Express account that appear to be construction and/or business related but do not appear to have been used for the BKS LLC construction on Lots 20, 28, 29, and 30 in Cantrell Heights and on 1, 2, 3, 4, 5, and 6 in Monclair above and beyond the $73,361.86 paid on the card by The Spivey Group, Inc. The following charges totaling $38,062.11 appeared on the Transaction Detail Report as being charged by the Defendant but are not reflected anywhere within the Job Costs Detail Report: (1) Sign O Rama for $976.04; (2) Roofing Supply Group for a total of $11,885.62; (3) Sprint Nextel for a total of $878.22; (4) OfficeMax for a total of $554.13; (5) Parkway Storage for a total of $1,124.00; (6) Lowe's for a total of $537.94; (7) 400 East Emory Road, Powell, TN for $70.00; (8) Kroger Fuel for $70.01; (9) Fireside Hearth for a total of $3,800.00; (10) Volunteer Wire Rope for $509.15; (11) Ingles Gas Express for a total of $186.06; (12) Northern Tool & Equipment for $99.34; (13) Frank Betz & Associates for $900.00; (14) Exxon Mobil for a total of $102.00; (15) Knox Auto Truck Plaza for $73.01; (16) AEC CAD Solutions for $137.66; (17) Checkmate Service for $176.90; (18) Copeland Corp. for $273.13; (19) Regal Petroleum for a total of $863.21; (20) Staples for $123.93; (21) RS Atlanta for a total of $13,038.58;

17

(22) Freightliner Knox for a total of $952.69; (23) Verizon Wireless for $163.86; and (24) Nextel Communications for $566.83. *Compare* Coll. Trial Ex. 11 *with* Trial Ex. 20. While it seems that some of these expenses were construction and/or business related expenses, because they do not appear on the Job Costs Detail Report, it is presumed that they were used for other projects than those in Cantrell Heights and/or Montclair.

Additionally, the Job Costs Detail Report evidences the following purchases associated with Lot 20 Cantrell Heights totaling $971.64 as being "credit card charges" that do not appear on the American Express Transaction Detail Report:  (1) to Enco Materials on July 12, 2007, for $67.74; (2) to Home Depot on July 31, 2007, for $344.92, on August 14, 2007, for $20.75, on August 14, 2007, for $145.23, on August 9, 2007, for $20.80, and a credit on August 9, 2007, of $13.71 for a total of $517.79; (3) to ICI Paints on July 31, 2007, for $341.24; and (4) to Tindell's Lumber on July 23, 2007, for $37.70 and on September 4, 2007, for $7.17 for a total of $44.87. *Compare* Coll. Trial Ex. 11 *with* Trial Ex. 20.

Finally, the following expenses listed on the Job Costs Detail Report are listed on the Detail Transaction Report; however, the amounts do not correspond:

| Vendor | Job Costs Detail Report | Detail Transaction Report | not accounted for |
|---|---|---|---|
| 84 Lumber | $50,630.52 | $92,208.74 | $41,578.22 |
| Home Depot | $517.79 | $1,116.23 | $598.44 |
| ICI-Paints | $341.24 | $1,916.78 | $1,575.54 |
| Tindell's | $44.87 | $343.45 | $298.58 |
| Gillenwater Flooring | $6,574.52 | $7,597.09 | $1,022.57 |
| Horizon Forest Products | $5,559.03 | $12,749.20 | $7,190.17 |

18

| | | | |
|---|---|---|---|
| United Rentals | $668.07 | $2,431.43 | $1,763.36 |
| ACT Metal | $456.58 | $530.30 | $73.72 |
| General Shale | $12,499.97 | $15,657.52 | $3,157.55 |
| Mayer Electric | $7,481.68 | $1,722.69 | -$5,758.99 |
| Kenny Pipe | $9,637.92 | $8,174.29 | -$1,463.63 |
| Knoxville Concrete | $214.65 | $11,414.13 | $11,199.48 |
| | | | |
| totals | $94,626.84 | $155,861.85 | $61,235.01 |

As demonstrated by the record, the Defendant charged a total of $223,444.75 on the American Express card, and of that total, the Defendant testified that $84,491.36 was for personal charges. Assuming that the entire $73,391.86 payment came from The Spivey Group, Inc. funds rather than BKS LLC funds, by his own testimony, the Defendant owes $11,099.50 above the payment he made towards his admitted personal charges. In addition to that amount, the court also finds that the Defendant is liable to the Plaintiffs for the $38,062.11 for business-related expenses shown on the Transaction Detail Report which are not found on the Job Costs Detail Report, the $971.64 for charges listed on the Job Costs Detail Report as "credit card purchases" not appearing on the Transaction Detail Report, and the $61,235.01 for expenses listed on the Job Costs Detail Report for different amounts than those listed on the Transaction Detail Report for a total of $111,368.26 associated with the American Express card.[11]

---

[11] This figure leaves $38,684.63 from the $223,444.75 charged by the Defendant; however, the record does not prove the Plaintiffs' entitlement to those funds, and it takes into account the Defendant's testimony that some of the expenses listed on the Transaction Detail Report, including hotel rooms in Las Vegas, Nevada, and Duluth, Georgia, were refunded and credited against his total amounts charged.

# III

Determinations as to the dischargeability of debts are governed by 11 U.S.C. § 523(a), which, as relevant to this adversary proceeding, provides that:

(a)  A discharge under section 727[12] . . . of this title does not discharge an individual debtor from any debt —

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by —

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . . .

(4)  for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; [or]

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. § 523(a).  Section 523(a) is construed liberally in favor of the Defendant and strictly against the Plaintiffs, who bear the burden of proving by a preponderance of the evidence the necessary elements for a determination of nondischargeability.  *Grogan v. Garner*, 111 S. Ct. 654, 661 (1991); *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

---

[12] Chapter 7 debtors receive a discharge of pre-petition debts, "[e]xcept as provided in section 523 of this title," 11 U.S.C. § 727(b) (2006), accomplishing the goal to relieve "honest but unfortunate" debtors of their debts and allow them a "fresh start."  *Buckeye Ret., LLC v. Heil (In re Heil),* 289 B.R. 897, 901 (Bankr. E.D. Tenn. 2003) (quoting *In re Krohn*, 886 F.2d 123, 125 (6th Cir. 1989) (citing *Local Loan Co. v. Hunt*, 54 S. Ct. 695, 699 (1934))).  The Defendant received a general discharge of debts on May 29, 2009.

## A

In order to satisfy the requirements of § 523(a)(2)(A), the Plaintiffs must prove the Defendant obtained money, property, or services through material misrepresentations that he knew were false or that were made with gross recklessness, that the Defendant intended to deceive the Plaintiffs, that they justifiably relied on the Defendant's false representations, and that the Plaintiffs' reliance was the proximate cause of their losses. *McDonald v. Morgan (In re Morgan)*, 415 B.R. 644, 649 (Bankr. E.D. Tenn. 2009).

> "[F]alse pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation[, while a]ctual fraud "consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another - something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."

*Copeland*, 291 B.R. at 760 (citations omitted). "[F]alse representations and pretenses encompass statements that falsely purport to depict current or past facts," *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983), and fraudulent intent may be "inferred as a matter of fact" based on the totality of the circumstances when the Defendant has engaged in conduct that was "somewhat blameworthy." *Copeland*, 291 B.R. at 759. Nevertheless, mere negligence or evidence of "[a] 'dumb but honest' [debtor] does not satisfy the test." *Copeland*, 291 B.R. at 765-66 (quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997)). Likewise,

> a broken promise to repay a debt, without more, will not sustain a cause of action under § 523(a)(2)(A). Instead, central to the concept of fraud is the existence of scienter which, for the purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation.

21

*EDM Mach. Sales, Inc. v. Harrison (In re Harrison)*, 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003) (citations omitted); *see also Palmacci*, 121 F.3d at 788 (stating that an honest belief that the representation is true, even if unreasonably so, "is an insufficient basis for deceit.").  The court must also find justifiable reliance; i.e., the party seeking a determination of nondischargeability actually relied on the representations and, based upon the facts and circumstances known at the time, the reliance was justifiable.  *Morgan*, 415 B.R. at 649.  In short, a determination of nondischargeability under § 523(a)(2)(A) often comes down to the defendant's conduct prior to, at the time of, and subsequent to the representations at issue and which witnesses are the most credible.  *Copeland*, 291 B.R. at 766; *Commercial Bank & Trust Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001).

The Plaintiffs aver that they are entitled to a nondischargeable judgment under § 523(a)(2)(A) on the basis that the Defendant falsely misrepresented to them that he was capable of managing the books and records of BKS LLC when, in fact, he was not, and that they relied upon his representations to their detriment.  In support of this contention, the Plaintiffs argue that the books and records were never adequately maintained and that pursuant to the Operating Agreement, the Defendant was required to provide them with monthly reports and give them full disclosure to the financial records, which he failed to do.  At trial, Mr. King testified that he repeatedly asked the Defendant for financial record information that he refused to provide, using the excuse that he had not yet set up the books and that he needed the assistance of Pam Reagan, whom he said was an accountant, to set them up, and that it was not until November 2007, after he was removed as managing member, that the Plaintiffs were given access to the financial information.

22

The record reflects that the Defendant did not immediately set up the books for BKS LLC and when he did, he and his wife, Julie Spivey, did so through the QuickBooks accounting software program which was on their personal home computer, and the resulting reports produced by the Defendant and introduced into evidence as Trial Exhibits 12, 19, and 20 are confusing and not easily reconcilable. Additionally, there is no dispute that the Defendant set up access to the company's bank account online and he controlled the account by having the password. Nevertheless, the record also reflects that the paper bank statements and all business correspondence from First Tennessee Bank were sent to BKS LLC's business post office box, that only the Plaintiffs had keys to the mailbox, and that Mr. Brown picked up the business mail. Additionally, Mr. Brown testified that he had online access to the American Express account, and both he and Mr. King testified that the Defendant provided them with a disc in May 2007, although Mr. Brown stated that he had to purchase the contractor's version of QuickBooks to access it and once he did, it contained incomplete and undetailed information.

In order to be a nondischargeable debt under subsection (a)(2)(A), there must be a showing of fraud in the inducement; i.e., the Plaintiffs must prove that the Defendant intentionally misled them into personally guaranteeing the construction loans and line of credit and opening the American Express account through fraudulent or material untruths and that they relied upon the untruths when they formed BKS LLC and incurred the liability. Without the initial inducement, it is not sufficient to show that the Defendant made misrepresentations and/or false statements concerning the financial information after the fact, just as it is not sufficient for a finding under this subsection to show that the Defendant denied the Plaintiffs access to the books and records. The record is clear that the

23

representations the Plaintiff made when he was approached by the Plaintiffs about forming the company that he was a licensed contractor and that he had business relationships with venders and subcontractors were accurate.  Additionally, the court is not convinced that the representation by the Defendant that he could manage the day-to-day operations was false or made with an intent to deceive and induce, based upon his approximately twelve years of experience in the building field and the fact that he had operated The Spivey Group, Inc. for approximately two years prior to forming BKS LLC with the Plaintiffs.  Accordingly, based upon the record before the court, the Plaintiffs have not met their burden of proof that the debt is nondischargeable under § 523(a)(2)(A).

## B

Section 523(a)(4) provides that debts obtained by embezzlement, larceny, or through fraud or defalcation while acting in a fiduciary capacity are nondischargeable.  For the purposes of this subsection and as it relates to this adversary proceeding, embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."  *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996).[13] "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud."  *Bd. of Trs. v. Bucci (In re Bucci)*, 493 F.3d 635, 644 (6th Cir. 2007) (quoting *Brady*,

---

[13] Larceny under § 523(a)(4) is proved if the debtor wrongfully and with fraudulent intent takes property from its rightful owner, *see Great Am. Ins. Co. v. O'Brien (In re O'Brien)*, 154 B.R. 480, 483 (Bankr. W.D. Tenn. 1993) (citing *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir. 1991)), and differs from embezzlement because the embezzler's initial acquisition of the property at issue is lawful. *Aristocrat Lakewood Nursing Home v. Dryja (In re Dryja)*, 259 B.R. 629, 632 (Bankr. N.D. Ohio 2001).  Defalcation under § 523(a)(4) requires proof of: "1) a fiduciary relationship; 2) breach of that fiduciary relationship; and 3) a resulting loss" and is limited to situations in which the debtor held or holds funds in an express or technical trust. *R.E. Am., Inc. v. Garver (In re Garver)*, 116 F.3d 176, 178-80 (6th Cir. 1997).  Only the embezzlement aspect of § 523(a)(4) is at issue in this adversary proceeding.

24

101 F.3d at 1173).  A finding of embezzlement does not, however, require the existence of a

fiduciary relationship.  *Jones v. Hall (In re Hall)*, 295 B.R. 877, 882 (Bankr. W.D. Ark. 2003).

To prove fraudulent misappropriation, the Plaintiff must prove "'fraud in fact, involving

moral turpitude or intentional wrong, rather than implied or constructive fraud.'"  *Bombardier*

*Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 876-77 (Bankr. D. Colo. 2004) (quoting *Driggs*

*v. Black (In re Black)*, 787 F.2d 503, 507 (1986)).  "Both the intent and the actual misappropriation

necessary to prove embezzlement may be shown by circumstantial evidence."  *Goodmar, Inc. v.*

*Hamilton (In re Hamilton)*, 306 B.R. 575, 582 (Bankr. W.D. Ky. 2004) (quoting *Bailey v. James (In*

*re James)*, 42 B.R. 265, 267 (Bankr. W.D. Ky. 1984)); *see also Estate of Harris v. Dawley (In re*

*Dawley)*, 312 B.R. 765, 779 (Bankr. E.D. Pa. 2004) (holding that fraudulent intent can be deduced

by examining "the facts and circumstances surrounding the act.") (citation omitted).  "The fraud

element may also be satisfied by a showing of deceit . . . and intent can be inferred from the relevant

circumstances."  *Powers v. Powers (In re Powers)*, 385 B.R. 173, 179-80 (Bankr. S.D. Ohio 2008).

As managing member, the Defendant was clearly entrusted with BKS LLC funds.  Pursuant

to paragraph 11 of the Operating Agreement, the Defendant was charged with the sole power and

authority to execute instruments on behalf of and legally bind the LLC.  As established by their

testimony, the Plaintiffs trusted that the Defendant was exercising this authority by utilizing the

construction loan draws, the line of credit, and the American Express card to pay the expenses of

BKS LLC and job costs for the houses being built and that he was acting within the duty of care he

owed to them, "to refrain[] from engaging in grossly negligent conduct, intentional misconduct, or

a knowing violation of law," as set forth in the Operating Agreement.  *See* COLL. TRIAL EX. 1.  In

25

addition, the Defendant was also subject to the following statutory standards of conduct for members

and managers:

(a) **Member-managed LLC**.   The only fiduciary duties a member owes to a member-managed LLC and the LLC's other members . . . are the duty of loyalty and the duty of care imposed by subsections (b) and (c). . . .

(b) **Duty of loyalty**.  A member's duty of loyalty to a member-managed LLC and the LLC's other members . . . is limited to the following:

(1) To account to the LLC and to hold as trustee for it any property, profit or benefit derived by the member in the conduct or winding up of the LLC's business, or derived from a use by the member of the LLC's property, including the appropriation of any opportunity of the LLC;

(2) Subject to § 48-249-404[14], to refrain from dealing with the LLC in the

---

[14] Section 48-249-404, entitled "Conflict of interest transactions," states, in material part, the following:

(a) **Definition**. A conflict of interest transaction is a transaction with the LLC in which a member . . . of the LLC has a direct or indirect interest. A conflict of interest transaction is not void and is not voidable by the LLC, and does not violate the duty of loyalty in § 48-249-403(b)(2), solely because of the interest of a member . . . if any one (1) of the following is true:

(1) The material facts of the transaction and the interest of the member . . . were disclosed or known . . . and . . . authorized, approved or ratified . . .;

(2) The material facts of the transaction and the interest of the member . . . were disclosed or known either to:

(A) The members entitled to vote and they authorized, approved or ratified the transaction; or

(B) All the members and all the members authorized, approved or ratified the transaction, even if one (1) or more, or all, the members have a conflict of interest;

(3) The transaction was fair to the LLC; or

(4) The transaction was of such a nature that the conflict of interest is waived by the LLC documents. Such waiver shall be upheld, unless manifestly unreasonable under the circumstances.

(b) **Indirect interest**. For purposes of this section, a member . . . has an indirect interest in a transaction, if, but not only if:

(1) Another entity in which the member . . . has a material financial interest, or in which the member . . . is a general partner, is a party to the transaction; or

(continued...)

26

conduct of winding up of the LLC's business as, or on behalf of, a person having an interest adverse to the LLC; and

(3) To refrain from competing with the LLC in the conduct of the LLC's business before the termination of the LLC.

(c) **Duty of care**. A member's duty of care to a member-managed LLC, and the LLC's other members . . . in the conduct of and winding up of the LLC's business, is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.

(d) **Good faith and fair dealing**. A member shall discharge the member's duties to a member-managed LLC and its other members . . . under this chapter or under the LLC documents, and shall exercise any rights with respect to the LLC consistently with the obligation of good faith and fair dealing.

(e) **Furtherance of member's own interest**. A member of a member-managed LLC does not violate a duty or obligation under this chapter or under the LLC documents, merely because the member's conduct also furthers the member's own interest.

(f) **Dealings with LLC**. A member of a member-managed LLC may lend money to and transact other business with the LLC. As to each loan or transaction, the rights and obligations of the member are the same as those of a person who is not a member, subject to other applicable law.

---

[14](...continued)

> (2) Another entity for which the member . . . is a member, governor, director, manager, officer or trustee is a party to the transaction, and the transaction is, or should be, considered by the members . . . of the LLC.

. . . .

(d) **Approval by members**. For purposes of subdivision (a)(2)(A), a conflict of interest transaction is authorized, approved or ratified, if it receives a majority vote of the membership interests entitled to be counted under this subsection (d). Membership interests owned by or voted under the control of a member . . . who has a direct or indirect interest in the transaction, and membership interests owned by or voted under the control of an entity described in subdivision (b)(1), may not be counted in a vote of members to determine whether to authorize, approve or ratify a conflict of interest transaction under subdivision (a)(2)(A). The vote of those membership interests, however, shall be counted in determining whether the transaction is approved under other provisions of this chapter.

. . . .

TENN. CODE ANN. § 48-249-404 (Supp. 2010).

27

. . . .

(k) **Reliance on others.** In discharging the duties described in this section, a member . . . is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:

> (1) One (1) or more officers or employees of the LLC whom the member . . . believes to be reliable and competent in the matters presented;

> (2) Legal counsel, public accountants or other persons as to matters the member . . . reasonably believes are within the person's professional or expert competence[.]

> . . . .

(l) **Unwarranted reliance.** A member . . . is not acting in good faith if the member . . . has knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (k) unwarranted.

(m) **Limitation on liability.** A member . . . is not liable for any action taken as a member . . ., or any failure to take any action, if the member . . . performs its duties in compliance with this section.

TENN. CODE ANN. § 48-249-403 (Supp. 2010).  With respect to personal liability, Tennessee Code

Annotated also provides, in material part:

> (a) Limited Liability Rule. (1) Except as provided in subsections (e) and (f), a member . . . of an LLC does not have any personal obligation and is not otherwise personally liable for the acts, debts, liabilities, or obligations of the LLC whether such arise in contract, tort or otherwise.

> (2) A member . . . of an LLC does not have any personal obligation and is not otherwise personally liable for the acts or omissions of any other member . . . of the LLC.

> (3) Notwithstanding the provisions of subdivisions (a)(1) and (a)(2), a member . . . may become personally liable in contract, tort or otherwise by reason of such person's own acts or conduct.

TENN. CODE ANN. § 48-217-101 (2002).

In his capacity as managing member, the Defendant was chosen by the parties to have the initial responsibility for setting up the LLC's books and finances and to be responsible for its day-to-day management. In association with these duties and with the Plaintiffs' knowledge and acquiescence, the Defendant requested draws on the construction loans and line of credit, withdrew funds from the BKS LLC account, and deposited them into The Spivey Group, Inc.'s account for disbursements to contractors and vendors on behalf of BKS LLC for its projects. Nevertheless, as previously discussed, the Defendant misappropriated large sums of BKS LLC funds, presumably for other projects and admittedly for his personal use, both without the authorization or knowledge of the Plaintiffs. By using BKS LLC funds for projects other than BKS LLC projects, the Defendant acted knowingly and fraudulently, and the Plaintiffs are entitled to a nondischargeable judgment against him for the amounts misappropriated from BKS LLC.

## C

The Plaintiffs also aver the applicability of § 523(a)(6) for a "willful and malicious" injury. In order to be successful under this subsection, they must prove the existence of "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury[,]" *Kawaauhau v. Geiger*, 118 S. Ct. 974, 977 (1998), and that the Defendant either desired to cause the consequences of his actions or believed with reasonable certainty that such consequences would occur. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999). "That a reasonable debtor 'should have known' that his conduct risked injury to others is simply insufficient. Instead, the debtor must 'will or desire harm, or believe injury is substantially certain to occur as a result of his behavior.'" *Guthrie v. Kokenge (In re Kokenge)*, 279 B.R. 541, 543 (Bankr. E.D. Tenn. 2002) (quoting

29

*Markowitz*, 190 F.3d at 465 n.10).  Additionally, "the injury must invade the creditor's legal rights."
*Steiner v. Best (In re Best)*, 109 Fed. Appx. 1, 6 (6th Cir. 2004).  Accordingly, based upon Sixth
Circuit authority, "unless the actor desires to cause consequences of his act, or . . . believes that the
consequences are substantially certain to result from it, he has not committed a 'willful and
malicious injury' as defined under § 523(a)(6)."  *Markowitz*, 190 F.3d at 464; *Kokenge*, 279 B.R.
at 543 (citations omitted).

"Although the 'willful' and 'malicious' requirements will be found concurrently in most
cases, the terms are distinct, and both requirements must be met under § 523(a)(6)."  *S. Atlanta
Neurology & Pain Clinic, P.C. v. Lupo (In re Lupo)*, 353 B.R. 534, 550 (Bankr. N.D. Ohio 2006).
"An act will be deemed 'willful' only if it was undertaken with the actual intent to cause injury,"
*Cash Am. Fin. Svcs. v. Fox (In re Fox)*, 370 B.R. 104, 119 (B.A.P. 6th Cir. 2007), which requires the
court to "look into the debtor's mind subjectively" in order to determine whether the debtor intended
to cause the consequences of his act or believed that the consequences were substantially certain to
result from his act[.]"  *Monsanto Co. v. Wood (In re Wood)*, 309 B.R. 745, 753 (Bankr. W.D. Tenn.
2004).  On the other hand, "[a]n act is 'malicious' if it is undertaken 'in conscious disregard of one's
duties or without just cause or excuse' . . . [and does] 'not require ill-will or specific intent to do
harm.'"  *Fox*, 370 B.R. at 119 (quoting *Wheeler v. Laundani*, 783 F.2d 610, 615 (6th Cir. 1986)).
"The conduct 'must be more culpable than that which is in reckless disregard of creditors' economic
interests and expectancies, as distinguished from . . . legal rights.  [K]nowledge that legal rights are
being violated is insufficient to establish malice . . . .'"  *Best*, 109 Fed. Appx. at 6 (quoting *In re
Mulder*, 306 B.R. 265, 270 (Bankr. N.D. Iowa 2004)).  In other words, "[l]ack of excuse or

justification for the debtor's actions will not alone make a debt nondischargeable under § 523(a)(6)." *Lupo*, 353 B.R. at 550.  Nondischargeability under § 523(a)(6) requires proof that the Plaintiff was injured and the Defendant's deliberate or intentional actions caused its injury, but "[m]ere negligence is not sufficient to except a debt from discharge under § 523(a)(6)."  *Fox*, 370 B.R. at 119.

The Plaintiffs argue that the Defendant converted the construction draws and line of credit. Unquestionably, acts of conversion may serve the basis for a determination of nondischargeability pursuant to § 523(a)(6).  Under Tennessee law, conversion "is the appropriation of tangible property to a party's own use and benefit in exclusion or defiance of the owner's rights."  *Thompson v. Thompson*, 2009 Tenn. App. LEXIS 99, at *45, 2009 WL 637289, at *14 (Tenn. Ct. App. Mar. 12, 2009); *see also Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977) (defining conversion as an intentional tort requiring proof that a party appropriated another's property for his own use by exercising dominion and control in exclusion or defiance of the owner's right to use and benefit from the property).  "The main focus of the tort is the interference with an owner's property right[ and t]he degree of this interference, as well as the impact on the property, determines whether there has been a conversion."  *Gen. Elec. Credit Corp. v. Kelly & Dearing Aviation*, 765 S.W.2d 750, 753 (Tenn. Ct. App. 1988).  "Nevertheless, while they do appreciably overlap, liability for conversion does not automatically equate with the existence of a nondischargeable debt under § 523(a)(6)."  *Superior Metal Prods. v. Martin (In re Martin)*, 321 B.R. 437, 441 (Bankr. N.D. Ohio 2004).  Whether an act of conversion constitutes a willful and malicious injury within the scope of § 523(a)(6) depends upon whether the party intended to cause the harm

31

or was substantially certain that such harm would occur.  *Sweeney v. Lombardi (In re Lombardi)*,
263 B.R. 848, 853 (Bankr. S.D. Ohio 2001).

Based upon the record, the court finds that although the Defendant did exercise dominion and
control over funds belonging to BKS LLC, he did not do so to the exclusion of the Plaintiffs, and
they are not entitled to a determination that his actions were willful and malicious for purposes of
§ 523(a)(6).  As previously discussed, there is no question that the bookkeeping for BKS LLC was
sloppy, at best, that the Defendant set up the LLC's books on his personal computer at his home, and
that the Defendant set up access to the LLC's bank account online without sharing the password with
the Plaintiffs, but that the Plaintiffs had access to bank statements through the mail and they had
online access to the American Express account.  Additionally, they chose the Defendant to act as
managing member and the Operating Agreement expressly gives the managing member the authority
to conduct all transactions on BKS LLC's behalf.  There is also no dispute that the Plaintiffs were
aware and were seemingly in agreement with the Defendant taking draws, writing checks from BKS
LLC to The Spivey Group, Inc., and subsequently paying invoices incurred for BKS LLC projects
from The Spivey Group, Inc.  The Plaintiffs testified that they were not provided with financial
records by the Defendant as required by the Operating Agreement, but they also testified that he
provided them with a disc in May 2007 with some of the requested financial information.

The court agrees that the Defendant acted in conscious disregard to the Plaintiffs, constituting
malicious conduct, but they have not proved that he acted willfully, with an intent to cause them
harm, which is likewise required by § 523(a)(6).

32

## IV

The Plaintiffs have also requested assessment of pre-judgment interest and their attorneys' fees and costs incurred in this adversary proceeding. There is no statutory authority mandating the award of pre-judgment interest, and the determination whether or not to do so is within the sound discretion of the court, "depend[ing] on whether the preferred creditor could have ascertained the amount of the preferential payment without a judicial determination." *Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1281 (8th Cir. 1988). Such an award should be based upon "considerations of fairness" and "awarded when it is necessary to make the wronged party whole." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 818 (9th Cir. 1994). If awarded, pre-judgment interest accrues from the date of demand on the defendant or the date that the adversary proceeding commenced at the current federal rate proscribed in 28 U.S.C. § 1961 (2006). *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 948, 1006 (Bankr. S.D. Ohio 1990); *see also Emerson v. Maples (In re Mark Benskin & Co., Inc.)*, 161 B.R. 644, 651 (Bankr. W.D. Tenn. 1993). With respect to attorneys' fees, "under the American Rule, absent statutory authorization or an established contrary exception, each party bears its own attorney's fees." *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997); *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005) ("In Tennessee, courts follow the American Rule, which provides that litigants must pay their own attorney's fees unless there is a statute or contractual provision providing otherwise.").

Here, there is no statutory basis for payment of attorneys' fees, nor does any contract or agreement between the parties provide that attorneys' fees will be paid in the event of a dispute. To

33

the contrary, paragraph 26 of the Operating Agreement expressly states that, in the event of dispute, "each party shall pay for and bear the costs of its own experts, evidence and attorneys' fees, except that in the discretion of the arbitrator any award may include the attorneys' fees of a party if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or in bad faith." Coll. Trial Ex. 1. Additionally, the Plaintiffs have previously obtained a default judgment in the amount of $441,481.54 against The Spivey Group, Inc., which is owned 100% by the Defendant, and are being granted a nondischargeable judgment against the Defendant personally. These judgments are sufficient to make the Plaintiffs whole, and pre-judgment interest will not be awarded.

# V

In summary, the court finds that the Defendant fraudulently misappropriated and embezzled funds which were entrusted to him pursuant to his position as managing member of BKS LLC. The record supports a judgment in favor of the Plaintiffs and against the Defendant in the total amount of $344,604.29, representing $3,961.81 in late fees and missed discounts, $120.18 for failing to return key sensors, $187,492.93 in funds received from the construction draws and line of credit with First Tennessee Bank by The Spivey Group, Inc. but  not attributable to any BKS LLC project, a credit of $2,617.69 for interest paid by The Spivey Group, Inc. to First Tennessee Bank but not accounted for by the Plaintiffs, $13,721.71 for invoices attached to the mechanic's lien filed by the Defendant against Lot 20 Cantrell Heights that had previously been paid with BKS LLC funds, $30,557.09 for the 10% builder's fee also included within the mechanic's lien, and $111,368.26 for

charges made by the Defendant on the American Express card for personal charges and charges which cannot be reconciled.  This judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

A judgment consistent with this Memorandum will be entered.


FILED: October 7, 2010

BY THE COURT

*/s/ RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE